UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WAYNE VINCENT TROIA                                    CIVIL ACTION

VERSUS                                                 NO. 05-339

DEWITT BEDWELL  ET AL.                                 SECTION "F" (2)

## REPORT AND RECOMMENDATION

At the time of the second telephone conference in this case, plaintiff, Wayne

Vincent Troia, was a pretrial detainee incarcerated in the East Louisiana Mental Health

System Forensic Unit in Jackson, Louisiana.  He filed this complaint pro se and in forma

pauperis pursuant to 42 U.S.C. § 1983 against Jefferson Parish Sheriff Harry Lee; two

of his deputies Sgt. Dewitt Bedwell and Glenn Jambon;  medical administrator Miriam

Schultz and Drs. Robert Wood and Lavie, all of whom worked at the Jefferson Parish

Correctional Center. Trois alleges that while incarcerated in the Jefferson Parish

Correctional Center in 2004, he was erroneously placed in the jail's general population

instead of being placed in a medical unit, and as a result another inmate in the jail burned

him.  He also alleges that he did not receive proper medical care for his psychiatric problems.  Troia seeks monetary damages and injunctive relief.  Record Doc. No. 1 (Complaint at ¶'s IV and V).

On March 31, 2005 and January 24, 2006, I conducted two separate telephone conferences in this matter.  Participating were plaintiff pro se and Daniel Martiny and Brian Carr, counsel for defendants.  Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

At the time of the first conference in March 2005, Troia remained incarcerated in the Jefferson Parish Correctional Center, awaiting trial on the criminal charge against him. Because Troia was unable during the March 2005 conference cogently or coherently to articulate his claims and in light of the pendency at that time of proceedings in the state court to determine his competency to stand trial on his criminal charges,  I concluded that Troia was not at that time in a mental condition suitable to assist the court in understanding his claims.  Accordingly, the conference was suspended.

Since that time, Troia was transferred from the Jefferson Parish Correctional Center to the East Louisiana Mental Health System Forensic Unit in Jackson, Louisiana, Record Doc. No. 28 (plaintiff's change of address notice to the court), for treatment and evaluation of his mental and psychiatric condition. After Hurricane Katrina, I scheduled a second conference to check on plaintiff's status and to determine if he was now in a

condition sufficient to proceed with his civil case. The second conference was conducted in January 2006, and I found Troia fully competent to expand upon and explain his claims.

## THE RECORD

During the second <u>Spears</u> hearing,[1] plaintiff testified that he was then incarcerated at the state psychiatric hospital in Jackson, Louisiana, as a pretrial detainee, awaiting competency proceedings and trial on a charge of armed robbery.  He testified that since he had been at the psychiatric hospital, "they've been giving me very good treatment here," and that he felt he was in much better condition to explain his claims.

Initially, Troia confirmed that he wants to pursue his lawsuit.  He testified that he has been at the psychiatric hospital for about seven months and is "feeling much better."

Plaintiff testified that he was scheduled to be returned to court in Jefferson Parish shortly for further proceedings.  He stated that he had been transported from the facility in Jackson a few weeks earlier for evaluation by two psychiatrists in Jefferson Parish, but

---

[1]Plaintiff's testimony during the first <u>Spears</u> hearing in March 2005 was so confused, convoluted and influenced by his then debilitated psychological condition that I have not set it out in detail in this report, particularly since his testimony in the second <u>Spears</u> hearing was coherent and complete as to all of his claims. The first <u>Spears</u> hearing was recorded, however, and the recording is in the Clerk's custody, Record Doc. No. 15, for use by any reviewing court.

3

he was not sure if the purpose of his upcoming court appearance was for a competency hearing.[2]

As to his first claim, Troia testified that while incarcerated in the Jefferson Parish Correctional Center as a pretrial detainee, he was set on fire on or about February 22, 2004, by another inmate named Shaun Bruno. He stated that he was housed at that time in a cell with double beds, and his cellmate was the "tier rep," whose responsibilities included keeping things clean on the tier. Plaintiff testified that on the date of the incident, he and the tier rep were reading in their cell, when Shaun Bruno and a couple of other inmates "came by the cell and started throwing smoke bombs and fireballs in the cell." He said the items they were throwing consisted of rolled up toilet paper they had set on fire.

Troia testified that one of the smoke bombs tossed by Bruno "hit my bed, but I didn't know it." He said he told the tier rep to get down and clean it up, but he then noticed that his leg had caught fire. Troia did not remember the name of the tier rep. He stated that Bruno was not one of his cellmates, but instead was on the tier and had passed by the door to Troia's cell when it was shut, "clowning around, throwing stuff in there." Troia testified that Bruno and the other inmates threw four or five of their homemade

---

[2]Later in the conference, counsel for the Jefferson Parish sheriff reported to the court and to plaintiff that plaintiff was scheduled to appear in the Jefferson Parish court on the day after the <u>Spears</u> hearing for a competency hearing.

fireballs into his cell.  He said he continued to read his book in his bed, but one of the fireballs must have landed between his hip and the wall against which his bed was positioned, with the result that his clothing caught fire.

Troia testified that he could not put the fire out, but deputies ran into the cell quickly and put out the fire for him.  He said he was burned in his left hip area.  He said the deputies ran into his cell and put their hands into the fire, trying to "pat it out."  He said one of the deputies ripped Troia's pants off to try to put the fire out, and they did in fact extinguish it.  Troia estimated that it took the deputies a matter of only about two minutes to extinguish the fire.  The deputies "reacted well, they came in and got it out, I do admit that," he said.

Asked to describe what the jail officials whom he has sued in this case did wrong that caused him to be burned by Bruno, Troia testified that he was then being housed "on the wrong floor" of the jail.  He said he should not have been on the floor where he was then located because the state court judge who was presiding over his criminal case had already determined that he would be sent to the state psychiatric facility for evaluation, but at that time, while he was still in the Jefferson Parish facility, "I couldn't understand nothing, I was hearing voices and things like that. . . . Being a mental patient, I don't think I should have been placed on the fourth floor" where he was burned, which he described as a general population area at the jail.  Troia alleged that he should have been

housed instead on the second floor, where there are facilities for mental patients and where he would have been safe, instead of on the fourth floor.

Troia testified that he had been placed on the fourth floor instead of the second floor because prison officials "just forgot about me, they should have transferred me on their own." Asked if he knew Shaun Bruno, Troia stated that Bruno was a troublemaker who had stolen things from other inmates, but he had not previously seen or heard that Bruno had attacked anyone else in the jail. He did not know why Bruno was then incarcerated.

Troia clarified that his claim concerning the fire is not that sheriff's deputies had anything to do with the fire, but that "they put me in the wrong place, they wouldn't take me to the doctors when needing to go to the doctors at the right time." He said that he went to the doctor a couple of times for his back, but each time he was just returned to his cell. He said the second floor would have been a safer place for him, and he could also have had his psychiatric condition monitored there.

Troia testified that he was provided with medical treatment at the jail for his burns. He said he was put in a holding tank on the second floor, a nurse examined him and offered him Motrin. He was then taken to the first floor medical unit, where salve was applied and he was bandaged. He said he had to return to the first floor unit for treatment of his burn several times, including when it later became infected.

6

Asked if the medical records I had ordered concerning his care were accurate, Troia said that they were "except for a couple of things."  He testified that Dr. Lavie cut him off from all his medications on November 1, 2004, including seroquil (sp), neurontin and efexil, which he described as anti-anxiety and panic attack medications.  He said that by February 2, 2005, Dr. Lavie had decided to put him back on those medications, but he suffered without his medication during those three months.  He testified that his pre-arrest psychiatrist, Dr. Kennison Roy, had prescribed those medications and said that they were not medications that should be suddenly halted.

Troia confirmed a reference in the medical records concerning treatment he received for a second degree burn to his hip, which had blistered to about two-by-five inches.  He confirmed that the burn was cleaned and dressed and that he was provided with Motrin, but testified that some of the skin had come off at the burn, that there was some bleeding and that he had to return several times to the first floor medical unit in the jail for medical treatment for the burn for about a month.  He said that during those followup visits, his bandage was removed and the burn was examined, salve was applied and then he was sent back to the fourth floor.  Troia stated that his burn healed after about four or five months, but now he has a "bad scar" about two or three inches wide and five inches long, with an indentation.

As to his medical care claim, Troia testified that it relates to two conditions, one involving the denial of his psychiatric medications and one for shoulder and/or back pain. He complained that he was cut off from his psychiatric medications for anxiety and a bipolar disorder for about three months, from early November 2004 to early February 2005.  He said that during this three-month period, he suffered anxiety and panic attacks, which his efexel was treating. He said that before Dr. Roy provided him with that medication prior to his arrest, his panic attacks and anxiety would cause him to run and hide in his room, as if he was "scared of the whole world."  Troia testified that when his medications were taken away in jail, "it was really, really difficult for me" because he suffered increased anxiety and panic attacks that previously had been controlled by the medication.

Asked if Dr. Lavie had given him any reason for taking him off that medication, Troia said he could only speculate that it was related to Troia's request to Dr. Woods to put him back on his pain medication for his back and his arm.  Plaintiff testified that Dr. Woods was treating him for his back pain and would sometimes say that he was going to send him to an orthopedic clinic for that problem, but he never went.  He said the medicine that was taken away from him by the doctors at the jail was "not medicine that somebody would try to take to try to get high on."

8

Troia testified that in February 2005, he asked Dr. Lavie politely and by explaining the purposes of the medications to be placed back on his psychiatric medications, and Dr. Lavie agreed. He said he was also seen about that time by a woman psychiatrist from the Louisiana State University health sciences center, who came to the jail and also put him back on the medications, after having obtained his medical records from Dr. Roy. He said after his medication was given back to him his psychiatric condition improved, and he was shipped to the state psychiatric facility at Jackson about four months later.

As to the medical treatment for his back pain, Troia testified that Dr. Woods examined him by checking his reflexes and blood pressure and told him that he would send him to an orthopedic clinic, but he was never sent. He said that, at one point, his back pain was so bad that he was brought to the jail medical unit in a wheel chair and seen by another doctor, who told Troia an MRI should be performed, but that was also never done. He said he was never taken to Charity Hospital for his back or arm pain. He said he received medication for his back pain for a short time, perhaps a month or two. He identified that medication as altram and said it was given to him from the time he arrived in the jail until November 1, 2004. He testified that his back pain medication was taken away from him at the same time his psychiatric medication was stopped, but it was not reinstated in February 2005, when he was again given his anti-anxiety medications,

and that he received no further treatment for his back pain before he was transferred to Jackson.

Troia testified that he had back surgery in 1995 or 1996, well before his arrest, and that Dr. Bernard Manale, his treating physician before his arrest, was contemplating a second back surgery, but Troia had decided against it. He testified that he was receiving medication and care for his back problems at the Jackson facility.

In conclusion, he alleged that some doctors were saying things about his condition to protect Jefferson Parish.

On cross-examination, Troia testified that he has sued Sheriff Lee because the sheriff is responsible for supervising the jail, but he confirmed that he had no personal contact with the sheriff himself. He stated that the sheriff's deputies were not telling the doctors how to treat him, but that it was the doctors he has sued who treated him improperly. He said that he should have been taken to the hospital to have his back checked. He acknowledged that Dr. Woods had told him he would be sent to an orthopedic clinic, but he was not sent to a clinic during the year-and-a-half he was in the Jefferson Parish jail. He said that Dr. Lavie wrote one prescription for efexil, but took it back because Troia was too hostile, which is one of the conditions the medication is intended to treat.

Troia acknowledged that he had received copies of two grievances he had submitted at the Jefferson Parish jail concerning his medical care for his back and psychiatric conditions and that he believed those were the only two grievances he had submitted at the jail.

## ANALYSIS

I.    STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the

11

plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing." Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the

facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the Spears hearing, fails to state a claim under the broadest reading.[3]

---

[3]Pro se civil rights complaints must be broadly construed, Moore, 30 F.3d at 620, and I have broadly construed the complaint in this case.

II.     PRISONER CLASSIFICATION

Troia testified that his placement in the general population area of the jail as opposed to the separate medical unit, resulted in his burning by another inmate.  His claim is that he should have been placed on a floor where there were facilities for mental patients.  However, plaintiff has no constitutional right to a particular status or classification within any prison. The classification of inmates is an administrative function of the prison.  Jones v. Diamond, 636 F.2d 1364, 1376 (5th Cir. 1981) (en banc).[4]  Courts accord great deference to prison officials' administrative decisions and will not interfere with legitimate administration without a constitutional violation.  Bell v. Wolfish, 441 U.S. 520, 547-48 (1979); Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990).  "Inmates have a federal right to due process at prison classification . . . only if state law contains 'substantive predicates' limiting the prison administrators' discretion to classify, assign, and punish inmates." Ricker v. Leapley, 25 F.3d 1406, 1409 (8th Cir. 1994); accord Canterino v. Wilson, 869 F.2d 948, 953 (6th Cir. 1989) (citing Hewitt v. Helms, 459 U.S. 460, 472 (1983)).  "Classification of inmates in Louisiana is a duty of the . . . [jailer] and an inmate has no right to a particular classification under state law." Woods v. Edwards, 51 F.3d 577, 581-82 (5th Cir. 1995) (citation omitted).

_____

[4]Overruled on other grounds by International Woodworkers of Am. v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986), aff'd sub. nom. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437 (1987).

Thus, "[i]nmates have no protectable property or liberty interest in custodial classification.  The classification of prisoners is a matter within the discretion of prison officials.  Absent an abuse of discretion, federal courts are loathe to interfere with custodial classifications established by prison officials." Whitley v. Hunt, 158 F.3d 882, 889 (5th Cir. 1998) (citations omitted), abrogated on other grounds by Booth v. Churner, 532 U.S. 732, 735 (2001).

Plaintiff's complaint concerning improper classification at the jail is not an abuse of the discretion the law assigns to prison officials and with which this court should not interfere.  No violation of Troia's federal constitutional rights occurred under the classification or jail area placement circumstances described in his testimony.

III.   MEDICAL CARE

Troia testified that his medical care claim relates to two conditions, one involving the denial of his psychiatric medications and one for shoulder and/or back pain.  Troia was a pretrial detainee during the time period about which he complains.  Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest.  Bell v. Wolfish,  441 U.S. 520, 539 (1979); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987).  The inquiry was

"whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

In Hare, however, the Fifth Circuit held:

(1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645. If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply. Id.

16

In <u>Estelle</u>, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  <u>Id.</u> at 105-06; <u>accord</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 182-83 (1976); <u>Hare</u>, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).  The <u>Farmer</u> definition applies to Eighth Amendment medical claims.  <u>Reeves v. Collins</u>, 27 F.3d 174, 176 (5th Cir. 1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  <u>Farmer</u>, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show deliberate indifference to his "serious medical needs" to satisfy this prong.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Farmer, 511 U.S. at 838 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998).

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S.Ct. 1382, 1391 (1997) . . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  Norton, 122 F.3d at 291.

In the instant case, plaintiff's pleadings as expanded by his testimony establish that nothing more than episodic acts or omissions as defined in Hare are at issue in this case.

Thus, the "deliberate indifference" standard applies and plaintiff must allege facts sufficient to establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  In this case, Troia fails completely to allege facts sufficient to establish deliberate indifference.

Initially, it cannot be concluded that the medical conditions Troia described presented a serious medical need that posed a substantial risk of harm during his incarceration at the jail.  See Lusk v. Dallas County Sheriff's Dep't, No. 3:00-CV-0662L, 2002 WL 31757706, at *4 (N.D. Tex. Nov. 29, 2002) (Lindsay, J.) (herniated disc and degenerative spinal disease not serious medical needs); Nelson v. Rodas, No. 01CIV7887RCCAJP, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (back spasms and pain not a serious medical need); Solomon v. Moore, No. 97 Civ. 0201(KTD), 2000 WL 385521, at *2-3 (S.D.N.Y. Apr. 14, 2000) (Duffy, J.) (when plaintiff was able to walk and function normally despite neck, back and groin pains, he had no serious medical needs); compare Palermo v. Correctional Med. Servs. Inc., 133 F. Supp. 2d 1348, 1359 (S.D. Fla. 2001) (Moreno, J.) (Plaintiff who suffered from constant, severe back pain that greatly limited his mobility and had a ruptured spinal disk, for which a neurosurgeon had recommended surgery, had a serious medical need). Troia's testimony about his anxiety attacks and his shoulder and back problems did not identify any serious risk of harm or any actual harm resulting from the alleged delays in

treatment, and they do not rise to the level of serious medical needs for purposes of constitutional analysis.

Even assuming that plaintiff's medical problems were serious conditions for constitutional purposes, he has alleged facts, confirmed by the medical records, that negate any inference of deliberate indifference by jail officials. Plaintiff's complaint, as amended by his testimony and confirmed by the medical records, shows that he received constitutionally adequate medical attention while incarcerated at the jail. Prison officials responded to plaintiff's complaints about his problems. Plaintiff's testimony and his verified medical records establish that he was examined by doctors, who considered and reviewed his conditions, provided him with medication and planned to refer him to an orthopedic clinic at a hospital outside the jail.

Although plaintiff has alleged delay in medical care between the time he first requested treatment and the time it was provided, including a three-month period during which a doctor's judgment was made that he should not be provided with anti-anxiety medications, and he is clearly dissatisfied with the timing and effectiveness of his treatment, none of his allegations rise to the level of deliberate indifference necessary to establish a constitutional violation cognizable under Section 1983.

First, mere delay or a mere gap in receiving care is not in and of itself a constitutional violation. <u>Mendoza</u>, 989 F.2d at 195; <u>Wesson v. Oglesby</u>, 910 F.2d 278,

284 (5th Cir. 1990); <u>Simons v. Clemens</u>, 752 F.2d 1053, 1056 (5th Cir. 1985). Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. <u>Wilson</u>, 501 U.S. at 298. The delay about which plaintiff complains did not cause "a life-long handicap or permanent loss" sufficient to constitute a serious medical need for constitutional purposes. <u>See Hill v. Dekalb Reg'l Youth Detention Ctr.</u>, 40 F.3d 1176, 1188 (11th Cir. 1994) (citing <u>Monmouth County v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay [in medical care] results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is serious.'")); <u>Wesson</u>, 910 F.2d at 283-84 (minor delay in escorting injured prisoner to prison infirmary for treatment of swollen wrists with some bleeding cannot be construed as deliberate indifference to serious medical needs). No such permanent loss resulting from delay has been alleged in this case, nor could such an allegation be made, given plaintiff's testimony that his conditions have improved during his incarceration at Jackson.

Contentions like Troia's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. For example, he disagrees with the doctor's decision to remove him from his anti-anxiety medications for three months, a decision that ultimately was reversed at the jail itself. "[A]lthough inadequate medical treatment may, at a certain point, rise to

the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Norton, 122 F.3d at 291-92; Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson, 910 F.2d at 284 (allegations establishing provision of medical treatment found inconsistent with inference of deliberate indifference). Therefore, plaintiff's complaints in this case about his medical care for either condition, including his disagreement with certain doctor's decisions, advance a legally frivolous argument and fail to state a claim for relief under Section 1983.

## IV.   FAILURE TO PROTECT

Construed broadly, Troia's allegation that he was burned by another inmate as a result of his improper placement or classification within the jail may also include that prison officials unconstitutionally failed to protect him from harm or attack.  As discussed above, Troia was a pretrial detainee at the time of the incident on which he bases this claim.  As Hare provides, "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted

22

inmates with . . . protection from harm during their confinement." <u>Hare</u>, 74 F.3d at 650. Thus, as noted above, regardless whether the inmate is a pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail officials that expose an inmate to being harmed by another inmate. <u>Hamilton</u>, 74 F.3d at 104 n.3; <u>Hare</u>, 74 F.3d at 650. Here, while plaintiff may allege that he was exposed to harm by prison officials' acts or omissions, he fails to state a claim cognizable under Section 1983.

Prison officials have a duty to protect inmates from harm or violence by other inmates. <u>Farmer</u>, 511 U.S. at 833; <u>Hare</u>, 74 F.3d at 650. The same two-pronged analysis applied above to Troia's claim of inadequate medical care also applies to his claim of failure to protect. Thus, the alleged deprivation must objectively be "sufficiently serious," which means that "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and the inmate must show that the prison official was deliberately indifferent to inmate health or safety. <u>Farmer</u>, 511 U.S. at 834; <u>accord</u> <u>Newton v. Black</u>, 133 F.3d 301, 308 (5th Cir. 1998). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837; <u>accord</u> <u>Newton</u>, 133 F.3d at 308. Again,

"'[s]ubjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291 (citing Farmer, 511 U.S. at 838-40).

In this case, it cannot be concluded that prison officials unconstitutionally exposed plaintiff to a substantial risk of serious harm because his own testimony confirms that prison officials had no reason to believe or even suspect that the inmate posed any danger to Troia. There was no history of prior incidents between Troia and the other inmate. The incident occurred suddenly and without warning and resulted in no serious injuries. As Troia testified, the reaction of deputies to the fire caused by the other inmate was swift, even heroic.

Under these circumstances, it cannot be concluded that any act or omission of prison officials knowingly exposed Troia to a substantial risk of serious harm. Any conceivable claim that prison officials violated his constitutional rights by failing to protect him from harm must be dismissed.[5]

------

[5]In the Prison Litigation Reform Act of 1996 ("PLRA"), Congress revised the exhaustion provision to require that a prisoner complete an available prison administrative remedies procedure ("ARP") before filing a Section 1983 suit and to eliminate the district court's discretion to permit a suit to proceed without exhaustion. Porter v. Nussle, 534 U.S. 516, 532 (2002) (citing the Civil Rights of Institutionalized Persons Act, 94 Stat. 352, as amended, 42 U.S.C. § 1997(e)). In short, 42 U.S.C. § 1997(e)(a) now mandates exhaustion of administrative remedies, stating that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a) (emphasis added). In Clifford v. Gibbs, 298 F.3d 328, 329 (5th Cir. 2002), the Fifth Circuit reiterated the Supreme Court's finding that the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Id. (citing Porter, 534 U.S. at 992) (emphasis added). Troia confirmed in his testimony that the only two ARP grievances he had submitted at the jail related to his medical care and

**RECOMMENDATION**

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __15th__ day of May, 2006.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

not to the burn incident involving Bruno, the other inmate. Thus, even if his allegations in this regard stated a claim, it would have to be dismissed without prejudice for failure to exhaust the available ARP.